UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------------X

KEITH FAGER,

Plaintiff,

-v-

NATIONAL RAILROAD PASSENGER CORPORATION, *d/b/a Amtrak* et al.,

Defendants.

---------------------------------------------------------------------X

24-CV-4432 (JMF)

OPINION AND ORDER

JESSE M. FURMAN, United States District Judge:

This case arises from an alleged accident during a construction project at Pennsylvania Station ("Penn Station"). Plaintiff Keith Fager alleges that, while descending a special kind of permanent stairway that led to his work site, he tripped and fell on a rope or string that was left hanging on one of the stairway's treads, seriously injuring his back and hip. Fager brings claims for violations of Sections 200, 240(1), and 241(6) of the New York Labor Law as well as common-law negligence against various Defendants, including the National Railroad Passenger Corporation ("Amtrak"), which owns Penn Station, and Boingo Wireless, Inc. ("Boingo"), the alleged general contractor. Amtrak and other Defendants (together, the "Amtrak Defendants") bring crossclaims for common-law indemnity and contribution against Boingo.

Now pending before the Court are several motions: (1) Boingo's motion to preclude the testimony of four of Fager's experts, (2) cross-motions by Fager, the Amtrak Defendants, and Boingo for summary judgment, and (3) the Amtrak Defendants' and Boingo's cross-motions for summary judgment on the crossclaims. For the reasons that follow, Boingo's motion to preclude Fager's experts is GRANTED in part and DENIED in part, as are the Amtrak Defendants' and

Boingo's motions for summary judgment on Fager's claims. Fager's motion for summary judgment on his claims, as well as the Amtrak Defendants' and Boingo's motions for summary judgment on the crossclaims are DENIED. The net result is that Fager's experts may testify, albeit with some caveats, in support of the sole set of surviving claims — most of his Section 241(6) claims — and that the Amtrak Defendants may renew their motion for summary judgment on the crossclaims if and when any such motion ripens.

## BACKGROUND

The following facts, drawn from the admissible materials submitted by the parties in connection with their cross-motions, are undisputed unless otherwise noted.

Fager was an electrician employed by nonparty E-J Electrical Installation Company ("E-J") on a construction project in Penn Station. ECF No. 70 ("Boingo's 56.1 Stmt. & Pl. Resp."), at 4 ¶ 6, 17 ¶ 4;[1] ECF No. 77 ("Amtrak Defs.' Pl. 56.1 Resp."), ¶ 6. The goal of the project was to design, build, and install a wireless communication network. *See* ECF No. 86 ("Pl.'s Amtrak Defs. 56.1 Resp."), ¶ 3; ECF No. 90 ("Boingo's Amtrak Defs. 56.1 Resp."), ¶ 3. To that end, the Metropolitan Transportation Authority ("MTA"), which leased the area of Penn Station at issue here from Amtrak,[2] licensed the area to Boingo to perform services — the nature of which is

---

[1] ECF No. 70 contains Boingo's counterstatement of material facts in response to Fager's summary judgment motion as well as its statement of material facts in support of its own summary judgment motion, each with its own numbered paragraphs. Accordingly, citations to it include both page and paragraph numbers. Separately, citations to ECF Nos. 73-3, 73-6, 73-8, 76-1, and 87-1 correspond to the page numbers automatically generated by the Court's Electronic Case Filing ("ECF") system.

[2] The parties often refer to the area of Penn Station at issue here as the "Mechanical Room," but there is some ambiguity — both in the motion papers and in the record — as to whether that term encompasses both Fager's work area *and* the stairway leading up to it or just the work area itself. *Compare, e.g.*, ECF No. 63-3 ("Boingo Dep."), at 73-75; ECF No. 67 ("Pl.'s Mem."), at 4-5; ECF No. 78 ("Amtrak Defs.' 56.1 Stmt."), ¶ 40, *with* ECF No. 63-1 ("Pl.'s Dep."), at 70-71; ECF No. 64-1 ("Rossello Dep."), at 51; ECF No. 64-2 ("Castelli Dep."), at 39; ECF No. 80 ("Boingo's Mem."), at 8-10, 19. Despite this ambiguity, there is no dispute

disputed — in connection with the project. *See* Boingo's 56.1 Stmt. & Pl. Resp. 2 ¶¶ 2-3; Amtrak Defs.' Pl. 56.1 Resp. ¶ 2; *see also* ECF No. 65-5 ("Licensing Agmt."). Boingo, in turn, hired E-J to build the network and perform the electrical installation work. *See* Pl.'s Amtrak Defs. 56.1 Resp. 1 ¶¶ 3, 8; ECF No. 84 ("Pl.'s Boingo 56.1 Resp."), ¶ 4; *see also* ECF No. 65-6 ("MSA").[3]

As relevant here, Fager's job consisted of "running" or installing conduit pipes in an elevated work area, which he accessed using an alternating tread stairway. *See* Amtrak Defs.' Pl. 56.1 Resp. ¶ 13; Boingo's 56.1 Stmt. & Pl. Resp. 4 ¶ 10, 18 ¶ 15; Pl.'s Amtrak Defs. 56.1 Resp. ¶¶ 3, 11; Boingo's Amtrak Defs. 56.1 Resp. ¶ 28; *see also* ECF No. 63-1 ("Pl.'s Dep."), at 34, 41, 54-55, 71-72; ECF No. 63-3 ("Boingo Dep."), at 73-74. This stairway — at times referred to as a "ship ladder" — was apparently installed as part of a different construction project and permanently affixed to the ground and the slab above. *See* Pl.'s Amtrak Defs. 56.1 Resp. ¶¶ 24-26; Boingo's Amtrak Defs. 56.1 Resp. ¶ 25; Boingo's 56.1 Stmt. & Pl. Resp. 5 ¶ 14; *see also* ECF No. 64-4 ("Silberman Aff."), Ex. 3.

Fager testified that, on the morning of July 11, 2022, around 8:00 a.m., he was descending this stairway to grab a wrench when his left foot got caught in a "dangling" rope or string affixed to one of its treads, which caused him to trip and fall about five feet to the lower level. *See* Pl.'s Dep. 68-69, 74-75, 77-81, 88, 138-39, 141-42, 151. Fager allegedly landed on

---

that Amtrak owns, and that the MTA licensed to Boingo, the relevant portion of Penn Station, that Fager worked in an elevated area, and that the subject stairway led to that area.

[3] The Master Services Agreement or "MSA" between Boingo and E-J appears to predate the Licensing Agreement between the MTA and Boingo. *Compare* ECF No. 65-5 ("Licensing Agmt."), at 1 (dated 2021), *with* ECF No. 65-6 ("MSA"), at 5 (dated 2019). But no one seems to dispute that the MSA governs the relationship between Boingo and E-J for the purposes of the project at issue. *See, e.g.*, Boingo's 56.1 Stmt. & Pl. Resp. 2-3 ¶¶ 4-5, 18 ¶¶ 12-13; ECF No. 77 ("Amtrak Defs.' Pl. 56.1 Resp."), ¶¶ 4-5.

his back and hip. *See id.* at 77-78. According to Fager, his partner, John Rossello — the only other person in his work area at the time of the accident, *see id.* at 34-35, 72, 82-83 — heard him "yell[] out when [he] fell," *id.* at 143, and came down the stairs as a result, *see id.* at 89, 143. After the fall, Fager observed that the rope was "swinging" and had some sort of anchor or metal weight attached to its end, *see id.* at 81, 138-39, 142, which he described as "about the size of a pen or a marker" like a Sharpie, *id.* at 139. For his part, Rossello testified that he heard Fager "curs[e]" or vocalize in some fashion, ECF No. 64-1 ("Rossello Dep."), at 52, after which he climbed down the stairs, *id.* at 53. Fager — then on his feet — then told Rossello that he had "tripped on the rope." *Id.* Rossello recalled seeing the rope after he came down the stairway, but not before, although he had apparently seen such a rope "in places it shouldn't be" on prior occasions, including once on the stairway. *See id.* at 56-57, 109-11.

Fager reports that, after the alleged accident, he walked with Rossello to the E-J office onsite and reported the incident to a subforeman. *See* Pl.'s Dep. 90-92, 94, 96-97. Fager did not recall with whom he spoke and denied discussing the accident with E-J subforeman Franco ("Frank") Castelli. *See id.* at 36, 91-92, 95-96; *see also* ECF No. 64-2 ("Castelli Dep."), at 5. Castelli, however, testified that Fager had reported the accident to him that same day and that he then produced a report regarding the incident. *See* Castelli Dep. 39-41, 47-58, 101-02. Per Castelli, Fager had reported that he "was coming down the ladder and he fell midway off the ladder or he . . . missed a step" and fell to the bottom. *Id.* at 40. Castelli also testified that no one had informed him about the existence of the rope and that he did not see the rope on the stairway when he inspected the accident area "at some point" after taking the report. *See id.* at 42-46, 58-59, 96-98. Consistent with this testimony, the incident report itself does not mention a rope. *See* ECF No. 76-1 ("Incident Report"). The report also includes a witness statement

apparently signed by Rossello, which likewise does not mention a rope, *see id.* at 4, although Rossello did not recall signing or reviewing it, *see* Rossello Dep. 62-65, 68-70.

On May 9, 2024, Fager filed suit against the Amtrak Defendants — namely, Amtrak; Penn District Station Developer, LLC; Skanska Penn Station Constructors, Inc. and seven associated entities[4] — for personal injuries sustained in his alleged fall. *See* ECF No. 1-1. Those Defendants removed the action to this Court, *see* ECF No. 1, after which Fager amended his Complaint and added Boingo as another Defendant, *see* ECF No. 18 ("FAC"); *see also* ECF No. 16. The operative Amended Complaint (the "Complaint") raises common-law negligence claims as well as claims under Sections 200, 240(1), and 241(6) of the New York Labor Law. *See* FAC ¶¶ 4-168. Thereafter, the Amtrak Defendants asserted a crossclaim against Boingo for indemnity and contribution. *See* ECF No. 22 ("Amtrak Defs.' Answer"), at 6-7. As noted, several motions are now pending before the Court. First, Boingo moves, on behalf of all Defendants, to exclude the testimony in whole or in part of four of Fager's experts: Scott Silberman, Dr. Stelios Koutsoumbelis, Dr. Daniel Wolstein, and Kristin Kucsma. *See* ECF No. 74 ("Boingo's *Daubert* Mem."). Second, Fager moves for summary judgment against Amtrak and Boingo on his claims under Section 240(1) (Count II) and 241(6) (Count III). *See* FAC ¶¶ 151-62; ECF No. 62; ECF No. 66 ("Pl.'s 56.1 Stmt."). Third, Defendants cross-move for summary judgment on all Counts of the Complaint. *See* ECF No. 79 ("Amtrak Defs.' Mem."); ECF No. 80 ("Boingo's Mem."). Finally, the Amtrak Defendants move for summary judgment

---

[4] The entities associated with Skanska Penn Station Constructors, Inc. are: Skanska Penn Station Constructors A Joint Venture, Skanska USA, Inc., Skanska USA Building, Inc., Skanska, Inc., Skanska USA Civil Northeast, Inc., Skanska USA Civil, Inc., and Skanska USA Commercial Development, Inc.

on their crossclaim for indemnity, *see* Amtrak Defs.' Mem. 15-16, while Boingo cross-moves for dismissal of the crossclaims in their entirety, *see* Boingo's Mem. 27-28.

**MOTION TO PRECLUDE FAGER'S EXPERTS**

The Court begins with Boingo's motion, on behalf of all Defendants, to preclude Fager's experts. The admissibility of expert testimony is governed by Rule 702 of the Federal Rules of Evidence, which, as amended in 2023, provides that "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify" to his or her opinion if "the proponent demonstrates to the court that it is more likely than not that":

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

FED. R. EVID. 702; *see Rutledge v. Walgreen Co.*, 182 F. 4th 168, 183-85 (2d Cir. 2026). In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), the Supreme Court emphasized the "gatekeeping role" of district courts with respect to expert testimony, declaring that "the Rules of Evidence — especially Rule 702 — . . . assign to the trial judge the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Id.* at 597. "The Rule 702 inquiry is a flexible one that depends upon the particular circumstances of the particular case at issue." *In re Gen. Motors LLC Ignition Switch Litig.*, No. 14-MD-2543 (JMF), 2016 WL 4077117, at *2 (S.D.N.Y. Aug. 1, 2016) (internal quotation marks omitted); *see also Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 150-52 (1999) (explaining that because "there are many different kinds of experts, and many different kinds of expertise," a court must be granted "considerable leeway in deciding in a particular case how to

go about determining whether particular expert testimony is reliable"). But the "standard requires district courts to look carefully at the qualifications and methodology of each expert." *Rutledge*, 182 F. 4th at 184.[5]

The focus of the Court's analysis under Rule 702 "must be solely on principles and methodology, not on the conclusions that they generate." *Daubert*, 509 U.S. at 595. Ultimately, "expert testimony should be excluded if it is speculative or conjectural, or if it is based on assumptions that are so unrealistic and contradictory as to suggest bad faith or to be in essence an apples and oranges comparison." *Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir. 1996) (cleaned up). Relatedly, a court should not "admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). Nor should an expert be permitted to "supplant the role of counsel in making argument at trial," *In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531, 541 (S.D.N.Y. 2004), or be permitted to merely "construct[] a factual narrative based upon record evidence," *Anderson News, L.L.C. v. Am. Media, Inc.*, No. 09-CV-2227 (PAC), 2015 WL 5003528, at *2 (S.D.N.Y. Aug. 20, 2015), *aff'd*, 899 F.3d 87 (2d Cir. 2018). Along similar lines, expert testimony regarding "an ultimate determination that [is] exclusively within [the jury's] province," including witness credibility, must also be precluded, *Nimely v. City of New York*, 414 F.3d 381, 398 (2d Cir. 2005), as must expert testimony "on issues of law," *United States v. Bilzerian*, 926 F.2d

[5] The 2023 amendments clarified that the preponderance standard governs all admissibility criteria, thus reaffirming the importance of the district court's gatekeeping function. *See* FED. R. EVID. 702 Advisory Committee Note to 2023 Amendment. The amendments were intended to correct a line of cases in which courts had improperly treated the sufficiency of an expert's factual basis and the reliability of the expert's methodology as questions of weight for the jury, rather than as threshold questions of admissibility for the court. *Id.*; *see also Rutledge v. Walgreen Co*, 182 F.4th 168, 193 n.25 (2d Cir. 2026) (observing that the amendments "sought to correct the 'hands-off' approach to expert testimony that the Rules Committee perceived had been applied by many district courts").

1285, 1294 (2d Cir. 1991). By contrast, "other contentions that the assumptions are unfounded go to the weight, not the admissibility, of the testimony." *Boucher*, 73 F.3d at 21 (internal quotation marks omitted). "[T]he traditional and appropriate means of attacking shaky but admissible evidence" are not exclusion, but "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof." *Daubert*, 509 U.S. at 596.

**A. Discussion**

As noted, Boingo moves to preclude, in whole or in part, the proposed testimony of Fager's four experts: Scott Silberman, Dr. Stelios Koutsoumbelis, Dr. Daniel Wolstein, and Kristin Kucsma. The Court will address each of these experts in turn.

**1. Scott Silberman**

Applying the standards set forth above, the Court concludes that the testimony of Fager's liability expert, Scott Silberman, must largely be excluded. Silberman is a civil engineer with expertise in, as relevant, building engineering and maintenance and construction site safety, *see* ECF No. 73-8 ("Silberman Report"), at 12-14, who was retained to offer testimony concerning the safety of the alternating tread stairway, *see* ECF No. 88 ("Pl.'s *Daubert* Mem."), at 21. Given his expertise, Silberman may testify to the design and function of the stairway, including whether the alleged dangling rope served any purpose in light of that design and function. *See* Silberman Report 6-8. He may also testify to safety issues concerning the stairway and the construction site, namely the proper uses of the stairway and the pertinence of any training as to those uses in light of industry practices. *See* ECF No. 64-3 ("Silberman Dep."), at 44-50, 86; *see also, e.g.*, *Csikos v. S.M. Constr. & Contracting, Inc.*, No. 18-CV-9598 (VEC), 2022 WL 3211462, at *5 (S.D.N.Y. Aug. 9, 2022) (allowing expert testimony on "safety standards and the proper use of a ladder on [a] construction site" in the context of a Section 240(1) claim).

Beyond those matters, however, Silberman's intended testimony runs afoul of the well-settled limits of expert testimony. For one, large portions of his report simply "rehash[] evidence in the case without providing any expert analysis," *Accent Delight Int'l Ltd. v. Sotheby's*, No. 18-CV-9011 (JMF), 2023 WL 2307179, at *28 (S.D.N.Y. Mar. 1, 2023), as when he summarizes Fager's account of the alleged fall, *see, e.g.*, Silberman Report 6-7. Similarly, other portions "opine[] on the inferences to be drawn from [the] evidence" without drawing on any specialized experience or knowledge, *Accent Delight*, 2023 WL 2307179, at *28, as when he asserts that the dangling rope was not integral to Fager's work because the "testimony conclusively establishes that no one knows why the [rope] was present" in the stairway, Silberman Report 10, or when he affirms that the rope — and nothing else — constituted a tripping hazard or otherwise rendered the stairway unsafe, *see* Silberman Report 8, 11; *see also* Silberman Dep. 64-65. At best, this testimony amounts to little more than "unhelpful commentary on 'lay matters which a jury is capable of understanding and deciding without the expert's help.'" *Accent Delight*, 2023 WL 2307179, at *28 (quoting *Andrews v. Metro N. Commuter R.R.*, 882 F.2d 705, 708 (2d Cir. 1989)); *cf., e.g.*, *Hawley v. Hannaford Bros. Co. LLC*, No. 16-CV-00249, 2018 WL 3647202, at *5 (D. Vt. Aug. 1, 2018) (excluding expert testimony that protruding hooks on a store display could "cause a tripping condition" because "any layperson can understand that protruding objects present a tripping hazard" (internal quotation marks omitted)). At worst, it "supplant[s] the role of counsel in making argument at trial," *In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d at 541, and "usurp[s] the jury's function," *Accent Delight*, 2023 WL 2307179, at *28; *cf. Capri Sun GmbH v. Am. Beverage Corp.*, 595 F. Supp. 3d 83, 134 (S.D.N.Y. 2022) (finding that an expert report did not "usurp the role of the jury" because the expert "usefully [drew] inferences that

would not be apparent without the benefit of experience or specialized knowledge" (internal quotation marks omitted)). Thus, these portions of Silberman's testimony must be excluded.

Additionally, much of Silberman's proposed testimony offers impermissible legal conclusions, including conclusions as to whether the Industrial Code regulations at issue in Fager's Section 241(6) claims are proper predicates for liability and whether Defendants violated those regulations and the statute. *See, e.g.*, Silberman Report 9-11; *see also, e.g.*, *Buono v. AvalonBay Communities, Inc.*, No. 19-CV-5413 (LGS), 2021 WL 51524, at *3 (S.D.N.Y. Jan. 6, 2021) ("The interpretation of an Industrial Code regulation presents a question of law." (cleaned up) (quoting *Morris v. Pavarini Const.*, 9 N.Y.3d 47, 51 (2007))); *Benzing v. Tully Const. Co., Inc.*, No. 21-CV-05315 (MMG), 2026 WL 866817, at *10 (S.D.N.Y. Mar. 30, 2026) (excluding expert testimony concerning whether the defendant violated Section 240(1) of the Labor Law). In fact, Silberman offers opinions about questions of law that are raised by the parties' instant motions (and resolved below), such as whether Boingo is properly named as a Defendant with respect to Fager's Labor Law claims and whether a stairway constitutes a "passageway" within the meaning of Section 23-1.7(e)(1) of the Industrial Code. 12 N.Y.C.R.R. § 23-1.7(e)(1). Finally, to the extent Silberman opines that Fager would not have fallen from the stairway but for the presence of the rope, *see, e.g.*, Silberman Report 8, he offers no basis for that conclusion, and so it "must [also] be excluded" as "mere *ipse dixit*," *Accent Delight*, 2023 WL 2307179, at *28; *see also* Pl.'s *Daubert* Mem. 21 (conceding that any attempt to "reconstruct the precise mechanics of [Fager's] fall" would exceed Silberman's expertise). Accordingly, to the extent Silberman's testimony crosses each of these lines, his testimony must be and is also excluded.

Boingo's remaining objections, however, "go to the weight, not the admissibility, of [Silberman's] anticipated testimony." *Csikos*, 2022 WL 3211462, at *5. To the extent Boingo

objects that Silberman's testimony is "premised on [unfounded] assumptions about disputed issues," *Accent Delight*, 2023 WL 2307179, at *28 — such as whether the rope was present in the first place, *see, e.g.*, Boingo's *Daubert* Mem. 23-25 — "that does not render his testimony inadmissible so long as it is left to the jury to decide whether those assumptions are valid," *Accent Delight*, 2023 WL 2307179, at *28. Further, although Boingo complains that Silberman did not visit or inspect the stairway himself and relied in part on undated photographs in forming his opinions, *see, e.g.*, Boingo's *Daubert* Mem. 23-24, those opinions are grounded in record evidence, *see* Silberman Report 5; Silberman Dep. 13-15, including Fager's testimony that, with the exception of the rope's placement, the photographs, *see* ECF Nos. 65-3 through 4, fairly depict the stairway and the rope's appearance on the day of the accident, *see* Pl.'s Dep. 83-86. As such, regardless of whether the photographs are themselves admissible, *see* FED. R. EVID. 703, Silberman's opinions are not so "speculative or conjectural" as to warrant exclusion, *Csikos*, 2022 WL 3211462, at *3 (quoting *Boucher*, 73 F.3d at 21); *see also id.* at *6 (rejecting similar objections).

**2. Dr. Stelios Koutsoumbelis**

That leaves Fager's damages experts. At a high level, Boingo's objections to Fager's expert testimony on damages pertain to the experts' qualifications as well as the reliability and relevance of their testimony, the latter of which involves nested objections as to Dr. Wolstein's and Kucsma's reliance on certain opinions rendered by Dr. Stelios Koutsoumbelis. For that reason, the Court begins with Dr. Koutsoumbelis, Fager's treating orthopedic surgeon.

Boingo first quarrels with Dr. Koutsoumbelis's proposed testimony on certain post-accident medical conditions, namely Fager's alleged hip avascular necrosis and post-operative delirium, on the ground that he is not qualified to render any such testimony. *See* Boingo's

*Daubert* Mem. 8-11. The Court disagrees. "Expert qualification requirements are liberally construed," *Monterey v. City of New York*, No. 17-CV-4477 (VEC), 2019 WL 5884466, at *3 (S.D.N.Y. Nov. 12, 2019), and "a doctor need not be a specialist in the exact area of medicine implicated by the plaintiff's injury [to provide competent testimony], as long as they have some specialized knowledge as a result of training or experience," *Goss v. Sealift Inc.*, No. 19-CV-5123 (CLP), 2024 WL 670405, at *20 (E.D.N.Y. Jan. 17, 2024) (cleaned up). Dr. Koutsoumbelis is a board-certified orthopedic and spinal surgeon. *See* ECF No. 87-1 ("Koutsoumbelis Report"), at 9-11. Given his training in orthopedic surgery and the "closely related" nature of "the fields of radiology and orthopedics," *Monterey*, 2019 WL 5884466, at *4; *see, e.g.*, ECF No. 73-2 ("Koutsoumbelis Dep."), at 53 (stating that "spinal fellow[s]" such as himself receive "extensive training" on radiology), he is qualified to interpret imaging studies and evaluate musculoskeletal conditions, not only in the spine — his specialty — but also in the hip, *see* Koutsoumbelis Report 6; Koutsoumbelis Dep. 47-49. *Cf., e.g.*, *Goss*, 2024 WL 670405, at *20 (finding that a "neurosurgeon with a specialized focus in spine surgery" was qualified to opine "on the ability of a biceps tear to heal without surgery and the impact of [the] plaintiff's biceps tear" in part because he "would have received basic training in orthopedics," "including conditions relating to the spine"); *Monterey*, 2019 WL 5884466, at *4 (finding that a board-certified radiologist was, in light of her "training in Diagnostic Radiology and the overlap between the fields of orthopedics and radiology," qualified to diagnose a sprain of a particular ligament and opine as to how it might have occurred).

Dr. Koutsoumbelis is also qualified to testify as to post-operative medication management and complications related to Fager's surgical procedures, including the possibility that any medications actually or typically prescribed due to such surgery or its complications

may cause delirium. *See* Koutsoumbelis Report 6-7; Koutsoumbelis Dep. 69-70, 73-76, 82, 86-89, 118-19; *cf., e.g.*, *Wilke v. Transp. Ins. Co*., No. CV-16-04055-PHX-JJT, 2019 WL 2611026, at *3 (D. Ariz. June 26, 2019) (finding that a board-certified orthopedic spine surgeon was qualified to testify about medical causation, including the effects of medications, because he, "like all physicians, is licensed to prescribe medication and possesses specialized knowledge about medications' effects"). Even if the records of the hospital where Fager received care for the delirium point to "suspected substance withdrawal" as the cause of that delirium, Dr. Koutsoumbelis's extensive experience with spinal surgeries and their aftermath provide "good grounds," *Monterey*, 2019 WL 5884466, at *5 (internal quotation marks omitted), for his opinion that the confluence of medications and substance withdrawal, *see* Koutsoumbelis Dep. 112, 117-19, may have actually caused that delirium. That said, while Boingo argues that Dr. Koutsoumbelis should be precluded from testifying that any such medications were the *sole* cause of the delirium, *see* Boingo's *Daubert* Mem. 11, neither Fager nor his expert appear to defend that position, *see* Pl.'s *Daubert* Mem. 10; Koutsoumbelis Dep. 109, 112. Accordingly, Boingo's motion on that limited score is granted as unopposed.

Next, Boingo objects to the reliability of Dr. Koutsoumbelis's opinions as to Fager's allegedly "asymptomatic" medical history prior to the accident at issue in this case. *See* Boingo's *Daubert* Mem. 6-8. Here, Boingo stands on firmer ground. The record suggests that Dr. Koutsoumbelis, who only treated Fager after his alleged fall, relied exclusively on self-reporting in concluding that Fager was "asymptomatic" between a laminectomy in the late 1990s and the 2022 accident and did not independently consider any pre-accident medical records or information. *See* Koutsoumbelis Report 5, 8; Koutsoumbelis Dep. 22-23, 30-32, 34-35, 37, 61-63, 104-08; *see also* Pl.'s *Daubert* Mem. 4-8. That includes, most notably, information that

Fager had been diagnosed with chronic back pain for which he was meant to be seeing a pain management doctor. *See* Koutsoumbelis Dep. 104-08; *see also* Pl.'s Dep. 168-73. Relying on Fager's self-reporting alone renders Dr. Koutsoumbelis's opinions with respect to whether Fager was "asymptomatic" prior to the 2022 accident both unreliable and unhelpful to the jury — which can draw its own conclusions from Fager's testimony about his medical history. Any such opinions are thus inadmissible. This is not to say, however, that Dr. Koutsoumbelis is precluded from offering opinions regarding his diagnosis and treatment of Fager's post-fall injuries, as well as the cause of those injuries, which are based in part on Fager's self-reporting. As Fager observes, *see* Pl.'s *Daubert* Mem. 5, treating physicians routinely consider a patient's narrative and subjective history in forming diagnoses and treatment plans. Thus, Dr. Koutsoumbelis may do so here. *See, e.g.*, *McCullock v. H.B. Fuller Co.,* 61 F.3d 1038, 1043-1044 (2d Cir. 1995) (affirming the admission of a treating physician's expert testimony on his patient's "ailment and its causes" where his opinions were based on a range of factors, including the patient's medical history "as she related it to him"); *Pfail v. Cnty. of Nassau*, 809 F. Supp. 3d 7, 18 (E.D.N.Y. 2025) (finding, on a motion for a new trial, that it was not an abuse of discretion to admit expert medical testimony as to brain injuries where the expert relied on the plaintiff's self-reporting and past medical records); *Franz v. New England Disposal Techs., Inc.*, No. 10-CV-201 (EAW) (LGF), 2016 WL 3344187, at *5 (W.D.N.Y. June 16, 2016) ("Treating physicians are expected to obtain and rely upon a patient's history of complaints or the lack thereof in making a diagnosis including the cause of the patient's current complaints and course of treatment.").

Last, Boingo seeks to preclude Dr. Koutsoumbelis from testifying that Fager requires immediate, round-the-clock in-home care as well as certain assistive aids (namely, a wheelchair or scooter), on the theory that it constitutes undisclosed and unfounded expert testimony. *See*

Boingo's *Daubert* Mem. 11, 13, 16; ECF No. 95 ("Boingo's *Daubert* Reply"), at 5. As to the disclosure issue, "[e]xpert testimony [that] exceed[s] the bounds of an expert's report is excludable pursuant to Federal Rule of Civil Procedure 37(c)(1)." *Looney v. Macy's Inc.*, 588 F. Supp. 3d 328, 354 (E.D.N.Y. 2021) (cleaned up). But even if that is what occurred here, exclusion is not warranted. *See Patterson v. Balsamico*, 440 F.3d 104, 117 (2d Cir. 2006) (laying out the factors for excluding testimony under Rule 37(c)). To the extent that Dr. Koutsoumbelis did not opine on Fager's need for 24/7 home healthcare or certain specific assistive aids in his report or deposition, he did opine on the matter in a questionnaire on "future care considerations" that he completed at Dr. Wolstein's request. *See* Pl.'s *Daubert* Mem. 11-12; *see also* ECF No. 73-5 ("Questionnaire"), at 5. The existence and contents of that questionnaire were expressly referenced in Dr. Wolstein's report, which was disclosed to Defendants in early May 2025, *see* ECF No. 73-3 ("Wolstein Report"), at 3, 11-12, well before Dr. Koutsoumbelis's deposition on June 24, 2025. Additionally, the questionnaire itself was shared with Defendants during Dr. Wolstein's deposition on June 27, 2025, *see* Boingo's *Daubert* Mem. 13, about two weeks *before* the close of expert discovery, *see* ECF No. 57. If Defendants believed they were prejudiced by the timing of these disclosures, they could have sought an extension of expert discovery or discovery sanctions — including, for example, an order permitting them to re-depose Dr. Koutsoumbelis at Fager's expense. *See* Boingo's *Daubert* Reply 5 (claiming prejudice based on the inability to depose Dr. Koutsoumbelis on the questionnaire); *see generally* FED. R. CIV. P. 37(c)(1). They did not, which undermines their disclosure-related arguments to exclude Dr. Koutsoumbelis's testimony on this front.

Boingo's arguments that Dr. Koutsoumbelis's opinions on these matters rest on insufficient facts or else do not "fit" with the facts of the case also fall short. *See* Boingo's

*Daubert* Mem. 11, 13. According to Dr. Koutsoumbelis, Fager underwent spinal fusion surgery, experienced severe complications, and "now has to live his life with loose hardware." Koutsoumbelis Report 7. He is unable to sit — as opposed to lying down — for extended periods without pain, and he relies on his mother and assistive devices — "a cane, a walker, a brace" — to ambulate and attend to his daily tasks. *See* Koutsoumbelis Report 7-8; Koutsoumbelis Dep. 94-97. These observations, learned in the course of treating Fager (and perhaps reviewing post-fall medical records), *see* Koutsoumbelis Dep. 22-23, 95, indicate that Dr. Koutsoumbelis's opinions are "'adequately grounded in the methods and procedures of science' and based on 'more than subjective belief or unsupported speculation,'" *Monterey*, 2019 WL 5884466, at *5 (quoting *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 267 (2d Cir. 2002), and then *Daubert*, 509 U.S. at 590); *cf., e.g.*, *Abreu Bautista v. Pagan-Rodriguez*, No. 24-CV-631 (JMF), 2025 WL 1730213, at *2-3 (S.D.N.Y. June 23, 2025) (excluding a treating physician's testimony regarding the plaintiff's likelihood of future surgery because the expert failed to explain the basis for his opinion). They also show that his assessment "fits the facts of this case." *Accent Delight*, 2023 WL 2307179, at *26 (internal quotation marks omitted). Indeed, on this point, it bears noting that, consistent with Dr. Koutsoumbelis's assessment, Dr. Wolstein testified that, to his knowledge, Fager's parents "help him with everything around the house; with cooking, cleaning and grocery shopping," ECF No. 73-4 ("Wolstein Dep."), at 58, that he uses a cane, *id.* at 95, and that he can drive "about 45 minutes at most," *id.* at 121. Against this backdrop, the Court cannot find that Dr. Koutsoumbelis's opinions regarding Fager's need for immediate, continuous in-home care and assistive devices such as a wheelchair or scooter are either "connected to existing data" by mere *ipse dixit* or "[ir]relevant to the task at hand. *Accent Delight*, 2023 WL 2307179, at *26 (internal quotation marks omitted). The Court

reaches a different conclusion, however, with respect to any opinion that Fager is "*completely* bedridden," Boingo's *Daubert* Mem. 11 (emphasis added), as any such opinion is belied by Dr. Koutsoumbelis's and Dr. Wolstein's own reports and depositions. *See, e.g.*, Koutsoumbelis Report 7; Koutsoumbelis Dep. 96-97; Wolstein Report 10-11; Wolstein Dep. 119-20, 123-24. Any such testimony is therefore excluded as lacking a sufficient factual foundation.

**3. Dr. Daniel Wolstein**

Next up is Dr. Daniel Wolstein, a certified life care planner, who proposes to offer testimony regarding Fager's future long-term medical needs. *See* Wolstein Report 2-3, 32-33. At the outset, because the Court has found that Dr. Koutsoumbelis's opinions — via the questionnaire — as to the need for 24/7 home health services and certain assistive devices (e.g., a wheelchair or scooter) are reliable and relevant, it follows that any objection to Dr. Wolstein's reliance on that questionnaire in projecting Fager's medical costs falls short. *See* Boingo's *Daubert* Mem. 13-15; *see, e.g.*, *Qureshi v. Costco Wholesale Corp.*, No. 1:20-CV-4086 (PK), 2022 WL 16757952, at *2 (E.D.N.Y. Nov. 8, 2022) ("[C]ourts in this circuit have admitted the expert testimony of lifecare planners whose findings are based on those of treating medical providers." (collecting cases)); *see also* Wolstein Dep. 58 (stating that he is also qualified to recommend home services "as a rehabilitation practitioner"). To be sure, there is some ambiguity with respect to precisely when Fager needs a wheelchair or power scooter, *see, e.g.*, Questionnaire 5; Wolstein Dep. 95, 98-100, 102-03, and thus as to the proper starting point for projecting costs associated with those devices. But Dr. Wolstein's conclusions are not so speculative or unfounded as to warrant preclusion, especially in light of his own interviews with Fager. *See, e.g.*, Wolstein Report 10-11. Any "gaps or inconsistencies" in his opinions on that

score "go to the weight of the evidence, not to its admissibility." *Restivo v. Hessemann*, 846 F.3d 547, 577 (2d Cir. 2017).

The same is true with respect to Dr. Wolstein's reliance on the questionnaire to project costs relating to future spinal surgery. *See* Wolstein Report 24-27. Granted, Dr. Koutsoumbelis rendered somewhat conflicting opinions with respect to future surgery. *Compare* Koutsoumbelis Report 7-8 (stating that he did not recommend additional surgery due to the serious risk of further complications), *with* Koutsoumbelis Dep. 93-94 (stating that additional surgery had "benefits" and was not "too high risk"). And his markings on the questionnaire on this front are terse and technical, *see* Questionnaire 4, so it is not entirely clear whether the additional surgery that he discusses in his report and deposition is the same as the surgery referenced in the questionnaire and thus included in Dr. Wolstein's cost projections. But so long as that is the case, his opinions regarding the need for future surgery — and by extension Dr. Wolstein's projections of its costs, *see* Wolstein Dep. 114-15 — are neither conjectural nor indicative of "bad faith." *Accent Delight*, 2023 WL 2307179, at *26; *see, e.g.*, Koutsoumbelis Report 6-7 (explaining the basis for such surgery); Koutsoumbelis Dep. 84-85 (elaborating further on the matter).[6] Accordingly, subject to the caveats discussed herein, the jury is entitled to hear all of the evidence on the projected costs of this future spinal surgery and to draw its own conclusions as to whether any such damages are warranted.

---

[6] Boingo asserts that "Fager was adamant that he does not want to undergo another surgery." Boingo's *Daubert* Mem. 16. But that assertion lacks support in the record, as Boingo cites to Dr. Wolstein's deposition, *not* to Fager's. *See id.* at 15 (citing Wolstein Dep. 113-14). Fager expressed concern about the risks associated with future surgery, but he was by no means "adamant" that he was closing the door on going that route. *See* Pl.'s Dep. 212-13.

**4. Kristin Kucsma**

That leaves Kristin Kucsma, Fager's economic expert, who was retained to evaluate Fager's economic losses. *See* ECF No. 73-6 ("Kucsma Report"), at 2, 8, 52-54. Boingo objects to Kucsma's assessment as to three categories of economic loss: future earnings, health insurance costs, and lifetime care costs. *See* Boingo's *Daubert* Mem. 17-22. As for future lost earnings, Boingo contends that Kucsma's opinion is based on a chain of impermissibly conjectural assumptions: (1) that Fager can never work again; (2) that he would have retired at the age of sixty-seven; and (3) that, had he not been injured in 2022, his income would have increased year after year. *See id.* at 20-21. Each link in this chain, however, satisfies *Daubert* scrutiny.

For one, Dr. Koutsoumbelis opined that Fager "is permanently and totally disabled from all work," Koutsoumbelis Report 8, and provided a sufficient basis for that opinion, *see id.*; Koutsoumbelis Dep. 95-97. Kucsma is entitled to incorporate those medical findings into her economic projections. *See* ECF No. 73-7 ("Kucsma Dep."), at 23. Further, that Fager stated that he should "have [had] *at least* 12 more years of work," Questionnaire 12 (emphasis added), does not render Kucsma's reliance on statistical data, *see* Kucsma Report 10; Kucsma Dep. 54-55, to calculate an age of retirement beyond that twelve-year mark unduly speculative. *Cf., e.g.*, *Phelps v. CBS Corp.*, No. 17-CV-8361 (AJN), 2020 WL 7028954, at *6 (S.D.N.Y. Nov. 30, 2020) (excluding calculations of fringe benefits drawn from national averages but "not based on any reliable, factually grounded assumptions specific to" the deceased plaintiff). And Kucsma's calculations are sufficiently anchored in wage-and-hour schedules from Fager's union as well as his actual earnings from the years immediately preceding his injury, *see* Kucsma Report 11-13 — not spun from whole cloth. Plus, at her deposition, Kucsma explained how her methodology accounted for the fact that, as Boingo emphasizes, Fager's earnings did not necessarily increase

year-to-year in the period before the accident. *See* Kucsma Depo. 65-67. With that in mind, the Court concludes that Kucsma's opinions on future earnings are sufficiently reliable to go to the jury. *See Dixon v. Reid*, No. 23-CV-09878 (JAV), 2025 WL 2417299, at *6 (S.D.N.Y. Aug. 21, 2025) ("The use of historical data may not provide exactitude, but allows for calculations to a reasonable certainty, which is all the law requires."); *cf., e.g.*, *Phelps*, 2020 WL 7028954, at *6 (admitting expert testimony on lost future earnings where the "average provided [was] grounded in [the deceased plaintiff's] *actual earnings preceding his death*").

For similar reasons, Boingo's challenge to Kucsma's calculation of Fager's health insurance costs also fails. *See* Kucsma Report 28 (explaining her methodology). And to the extent Boingo argues that Kucsma's methodology allows for double recovery because it projects "future medical costs" as well as "future health insurance costs," Boingo's *Daubert* Mem. 20, that is neither necessarily true nor an argument about the reliability of her opinion, and, in any event, may be addressed with appropriate jury instructions. *See Augenbaum v. Anson Invs. Master Fund LP*, No. 22-CV-249 (AS), 2025 WL 2780854, at *10 (S.D.N.Y. Sept. 30, 2025) ("Disagreement on the merits of an expert's opinion — rather than to an expert's methodologies or qualifications — is not proper grounds for exclusion."). Finally, to the extent that Boingo seeks to preclude Kucsma's testimony on Fager's lifetime care costs because they rely on Dr. Wolstein's life care plan, *see* Boingo's *Daubert* Mem. 17-19; *see also* Kucsma Dep. 22-23, 93, 95, that argument fails for the same reasons its objections to Dr. Wolstein's testimony did.

In sum, Boingo's motion to preclude Fager's experts is GRANTED in part and DENIED in part. All of Fager's experts may testify, albeit within the bounds set forth above.

**SUMMARY JUDGMENT MOTIONS**

With that, the Court turns to the parties' motions for summary judgment. Summary judgment is appropriate where the admissible evidence and pleadings demonstrate "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); *see also Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012) (per curiam). A dispute over an issue of material fact qualifies as genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *accord Roe v. City of Waterbury*, 542 F.3d 31, 35 (2d Cir. 2008). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). "In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant's burden will be satisfied if he can point to an absence of evidence to support an essential element of the nonmoving party's claim." *Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995) (citing *Celotex*, 477 U.S. at 322-23).

In ruling on a motion for summary judgment, all evidence must be viewed "in the light most favorable to the non-moving party," *Overton v. N.Y. State Div. of Military & Naval Affs.*, 373 F.3d 83, 89 (2d Cir. 2004), and the Court must "resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought," *Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.*, 391 F.3d 77, 83 (2d Cir. 2004). To defeat a motion for summary judgment, the non-moving party must advance more than a "scintilla of evidence," *Anderson*, 477 U.S. at 252, and demonstrate more than "some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Where, as here, both sides move for summary judgment, the Court is

"required to assess each motion on its own merits and to view the evidence in the light most favorable to the party opposing the motion, drawing all reasonable inferences in favor of that party." *Wachovia Bank, Nat'l Ass'n v. VCG Special Opportunities Master Fund, Ltd.*, 661 F.3d 164, 171 (2d Cir. 2011).

**A. Discussion**

The Court begins the question of whether Boingo is a proper Defendant before turning to the motions pertaining to Fager's claims and the Amtrak Defendants' crossclaims.

**1. Boingo's Status as a Labor Law Defendant**

Claims under Sections 200, 240(1), and 241(6) of the Labor Law may be brought against owners, contractors, and their agents. *See Hill v. Mid Island Steel Corp.*, 83 N.Y.S.3d 626, 627 (2d Dep't 2018) ("Labor Law § 200 is a codification of the common-law duty imposed on owners, contractors, and their agents[.]" (internal quotation marks omitted)); N.Y. LAB. LAW § 240(1) (applying to "[a]ll contractors and owners and their agents"); N.Y. LAB. LAW § 241 (applying to "[a]ll contractors and owners and their agents"). For purposes of all three sections, "a lessee of the property where the construction was taking place . . . is deemed to have been property owner." *Douglas v. Tishman Constr. Corp.*, 169 N.Y.S.3d 277 (2022). Amtrak does not dispute that it owns Penn Station, Pl.'s 56.1 Stmt. ¶ 2; Amtrak Defs.' Pl. 56.1 Resp. ¶ 2, and thus is a proper Defendant. Boingo, however, argues that it was neither an owner nor a general contractor, but rather a "design professional with construction management liaison duties," and thus may not be held liable for any of Fager's claims. Boingo's Mem. 14. Boingo is mistaken.

"To be treated as a statutory agent, the subcontractor must have been delegated the supervision and control either over the specific work area involved or the work which gave rise to the injury." *Rodriguez v. Riverside Ctr. Site 5 Owner LLC*, 235 N.Y.S.3d 55, 58 (1st Dep't

2025) (cleaned up); *see also, e.g.*, *Weekes v. Tishman Techs. Corp*., 235 N.Y.S.3d 356, 362 (2d Dep't 2025) ("[T]he core inquiry is whether the defendant had the authority to supervise or control the activity bringing about the injury so as to enable it to avoid or correct the unsafe condition." (internal quotation marked omitted)); *Prevost v. Associated Materials, LLC*, 232 N.Y.S.3d 861, 862 (4th Dep't 2025) ("Critically, it is the actual authority and responsibility to coordinate, supervise, enforce, and hire that is dispositive[.]" (cleaned up)). "The test of whether a defendant is a statutory agent subject to liability under those sections is not whether it actually supervised the work, but whether it had the authority to do so." *Kiss v. Clinton Green N., LLC*, No. 17-CV-10029 (LGS), 2020 WL 4226564, at *4 (S.D.N.Y. July 23, 2020) (cleaned up).

The record shows that Boingo — not E-J — contracted directly with the lessees of the construction area for the design, construction, and installation of the wireless network at Penn Station. *See* Licensing Agmt. 1 & ¶¶ 9.1(a), 17.1. Per that contract, Boingo was required to select and hire subcontractors for the construction and installation of the network, *see id.* ¶ 2.2(h), and it was deemed to have "complete and sole responsibility" over any of the contractors it hired, *id.* § 50.5(f). That included E-J, which Boingo indisputably selected and hired to perform the network build. *See* Boingo's 56.1 Stmt. & Pl. Resp ¶ 4; MSA; Boingo Dep. 269 ("Nobody else chose E-J."). Additionally, Boingo was responsible for overseeing and coordinating the work, *see* Licensing Agmt. ¶¶ 5.3-5.4, 17.2(c); *see also* Boingo Dep. 53-55, 88-89, 165, as well as for ensuring contractors' compliance with safety requirements and taking precautions and corrective action to minimize the risk of injuries, *see* Licensing Agmt. ¶¶ 7.1(b)(iii), 15.3; *see also* Boingo Dep. 178-80.

If anything, the fact that Boingo later delegated several of its supervisory responsibilities — including the "sole[] responsib[ility] for initiating, maintaining and supervising all safety

precautions and programs" — to E-J confirms Boingo's supervisory authority and control. MSA ¶ 6.12; *see also id.* ¶¶ 6.2, 6.13; *cf. Nascimento v. Bridgehampton Const. Corp.,* 924 N.Y.S.2d 353, 356 (1st Dep't 2011) (noting that "evidence that a subcontractor delegated the requisite supervision and control to another subcontractor has been cited as forming part of the proof that the first subcontractor formerly possessed that authority"). To a lesser extent, so too does Boingo's conduct on the worksite. Indeed, Boingo's representative, Jose Daniel Diaz, offered testimony that, from March to July 2022, Boingo was on site "just about" every day, Boingo Dep. 53, and "probably every other day" conducted inspections of E-J's work, including the work that was performed in Fager's work area, to ensure it was done in accordance with the plans, Boingo Dep. 84; *see also id.* at 50-51, 57-60, 71, 75-76, 81-84; *cf. Walls v. Turner Constr. Co.*, 4 N.Y.3d 861, 864 (2005) (relying in part on testimony of the defendant's representative that the defendant had "authority to control activities at the work site and to stop any unsafe work practices" in affirming summary judgment).

Taken together, this record establishes as a matter of law that Boingo possessed the authority, delegated by the premises' owner, to supervise and control Fager's work. Thus, it was an "agent" within the meaning of the Labor Law — regardless of the title it was given and the extent to which it actually exercised its authority. *See Walls*, 4 N.Y.3d at 864 (indicating that the title assigned to an entity is "not necessarily determinative" of liability under Labor Law § 240(1)); *Tejada-Rodriguez v. 76 Eleventh Ave. Prop. Owner LLC.*, 217 N.Y.S.3d 548 (1st Dep't 2024) (concluding that the "defendant . . . was a general contractor or statutory agent for purposes of Labor Law § 240 (1)" because it "hired plaintiff's employer for concrete superstructure work and had the authority to exercise control over the work that brought about plaintiff's injury, regardless of whether it exercised that authority with respect to plaintiff's

task"); *Devita v. NYY Steak Manhattan, LLC*, 185 N.Y.S.3d 107, 109-10 (1st Dep't 2023) (finding that, where the relevant contract delegated authority to a defendant to supervise and control a construction project, "[t]hat it may not have actually" exercised such supervision and control was "not dispositive" of its status as an agent). Boingo's efforts to liken its circumstances to that of the defendant construction manager in *Delahaye v. Saint Anns School*, 836 N.Y.S.2d 233 (2d Dep't 2007), are unavailing, as that defendant's contract with the premises owners "specifically provided that [it] shall not have control over or charge of and shall not be responsible for" both the means and methods of construction *and* "safety precautions and programs in connection with the Work of each of the Contractors," and the defendant did not otherwise assume responsibility for the subcontractor's work. *Id.* at 238 (internal quotation marks omitted). Accordingly, Boingo may not escape Labor Law liability by recasting its role as a "mere design professional," and is indeed a proper Labor Law defendant.

**2. Section 200 and Common-Law Negligence**

With that matter resolved, the Court turns to each of Fager's substantive claims. First, Defendants seek summary judgment on Fager's Section 200 and common-law negligence claims. Section 200 of the New York Labor Law codifies the common-law duty to provide workers with a safe work environment. *See, e.g.*, *Palmer v. Amazon.com, Inc.*, 51 F.4th 491, 507, 514 (2d Cir. 2022); *Hill*, 83 N.Y.S.3d at 627. For that reason, "courts generally analyze claims brought under both [that provision] and the common law simultaneously." *Kiss*, 2020 WL 4226564, at *5. Under Section 200, liability may attach (1) when a plaintiff's injury arises from "a subcontractors methods or materials," so long as the defendant "exercised some supervisory control over the operation"; and (2) when the injury "arises from a defective [or dangerous] condition on the premises," so long as the defendant created the condition, or had actual or

constructive notice of, "the defective or dangerous condition" and failed to remedy it. *Sheerin v. Tutor Perini Corp.*, No. 18-CV-7952 (ALC) (SLC), 2022 WL 992917, at *9 (S.D.N.Y. Mar. 31, 2022) (cleaned up). Fager purports to bring claims under both theories. *See* ECF No. 82 ("Pl.'s Boingo Opp'n"), at 24-27; ECF No. 85 ("Pl.'s Amtrak Defs. Opp'n"), at 20-25. But neither theory succeeds.[7]

To prevail under the first theory, Fager must prove that Defendants "controlled *the manner* in which [he] performed his . . . work." *Vasquez v. GMD Shipyard Corp.*, 582 F.3d 293, 301 (2d Cir. 2009) (emphasis added); *accord, e.g.*, *Casilari v. Condon*, 127 N.Y.S.3d 548, 550-51 (2d Dep't 2020) ("A defendant has the authority to supervise or control the work for purposes of Labor Law § 200 when that defendant bears the responsibility for the manner in which the work is performed."). He fails to do so. Fager's claims that Amtrak and Boingo exercised control over the means and methods of his work rest largely on the theory that they supervised and coordinated E-J's work, enforced safety standards, and retained stop-work authority. *See* Pl.'s 56.1 Stmt. ¶¶ 37-47; Pl.'s Boingo Opp'n 25; Pl.'s Amtrak Defs. Opp'n 23-24. But "[t]he retention of the right to generally supervise the work, to stop the contractor's work if a safety violation is noted, or to ensure compliance with safety regulations does not amount to the supervision and control of the work site necessary to impose liability on an owner or general contractor pursuant to [Section] 200." *Laverty v. Dobco, Inc.*, No. 21-CV-2592 (VR), 2024 WL

7 In arguing otherwise, Fager asserts that Defendants failed to adduce sufficient evidence to establish a lack of control over the manner of his work or a lack of notice of the dangerous condition. *See* ECF No. 82 ("Pl.'s Boingo Opp'n"), at 26; ECF No. 85 ("Pl.'s Amtrak Defs. Opp'n"), at 21-24. In doing so, he gets the parties' burdens backwards. As Fager carries the burden of proof on these issues at trial, Defendants may discharge their burden at summary judgment by pointing to the "absence of evidence to support [his] case," *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986), and Fager may not defeat their motion "on the basis of conjecture or surmise," *Gottlieb v. Cnty. of Orange*, 84 F.3d 511, 518 (2d Cir. 1996).

966013, at *10 (S.D.N.Y. Mar. 6, 2024) (internal quotation marks omitted); *see also, e.g.*, *Lewis v. Lendlease (US) Constr. Lmb Inc.*, No. 18-CV-8662 (LJL), 2021 WL 5762419, at *13 (S.D.N.Y. Dec. 2, 2021) ("[A]bsent any evidence that a defendant gave anything more than general instructions as to what needed to be done, as opposed to how to do it, these entities cannot be held liable under NYLL § 200 or for common-law negligence." (cleaned up)); *Sheerin*, 2022 WL 992917, at *10 (finding that the fact that the general contractor's project manager "testimony that he would try to walk the temporary bridge each day to search for dangerous conditions" was insufficient to give rise to supervisory control for Section 200 and common-law liability). *Urban v. No. 5 Times Square Development, LLC*, 879 N.Y.S.2d 122 (1st Dep't 2009), on which Fager relies, *see* Pl.'s Boingo Opp'n 25-26; Pl.'s Amtrak Defs. Opp'n 24-25, is not to the contrary, as it too holds that the plaintiff must show supervision and control over "the manner of his work," as opposed to just "control over the work site," to prevail on a manner claim. *Id.* at 125-26 (internal quotation marks omitted).

To the extent that Fager relies on conclusory references to Amtrak and Boingo directing the manner of E-J's work in the affidavit of E-J foreman Frank Occhuizzo, *see* Pl.'s Boingo Opp'n 6, 25; Pl.'s Amtrak Defs. Opp'n 24; *see also* ECF No. 64-7 ("Occhuizzo Aff."), ¶¶ 5, 11, those references are too thin a reed for the Court to find that Defendants exercised any such control. *See Hicks v. Baines*, 593 F.3d 159, 167 (2d Cir. 2010) ("[A] party cannot create a triable issue of fact merely by stating in an affidavit the very proposition they are trying to prove."). In fact, other E-J employees testified that similar references in their affidavits essentially alluded to Defendants' "mere general supervisory authority." *Turgeon v. Vassar Coll.*, 100 N.Y.S.3d 374, 377 (2d Dep't 2019) (cleaned up). *Compare* ECF No. 64-5 ("Rossello Aff."), ¶¶ 10, 18, 23, *and* ECF No. 64-6 ("Castelli Aff."), ¶¶ 7, 11, *with* Rossello Dep. 87-93 *and* Castelli Dep. 77-79. And

the record points to E-J as the sole entity responsible for the means and methods of Fager's work. *See Corral v. Outer Marker Global Steel, Inc.*, 2011 WL 4434085, at *6 (E.D.N.Y. Sept. 20, 2011) (finding that evidence that a defendant's representative was present at work site every day, held a safety meeting, and gave general instructions was insufficient to show specific exercise of control where instructions on how to perform the job were given by employee of another entity). The contract between Boingo and E-J, for example, provides that E-J "shall be *solely* responsible for the means, methods, techniques, sequences and procedures employed for" the construction. MSA § 6.2(A) (emphasis added); *see also id.* § 6.16(A). And the contract vests E-J with "full responsibility" for furnishing the tools and equipment for the project. *Id.* § 6.3(B). Further, testimony in the record — including Fager's — indicates that E-J determined work methods, provided equipment, and assigned E-J employees their respective job responsibilities. *See* Pl.'s Dep. 48-49, 60, 124; Rossello Depo. 44, 77, 87; Castelli Dep. 65.

In sum, no reasonable jury could conclude that Amtrak or Boingo — let alone any other Defendant — controlled the manner of E-J's work generally or Fager's specifically. Accordingly, the first theory does not support Fager's Section 200 and negligence claims.

Nor does the second theory. To prevail on that theory, Fager must prove that Defendants either created or had "actual or constructive notice of, the defective or dangerous condition on the premises." *Sheerin*, 2022 WL 992917, at *9. But Fager makes no argument and points to no evidence that any Defendant created or had actual notice of the rope's presence on the stairway. *See* Pl.'s Boingo Opp'n 26; Pl.'s Amtrak Defs. Opp'n 21-22. And with good reason: Witness testimony indicates that no one observed the rope on the stairway before the fall. *See* Pl.'s Dep. 74-75, 81-82, 138-39; Rossello Dep. 54-57, 61-62, 108-10; Castelli Dep. 42-46; ECF No. 63-2 ("Amtrak Dep."), at 198-99; Boingo Dep. 282; ECF No. 63-4 ("Skanska Dep."), at 126. Thus,

Fager rests his case on constructive notice, which requires a showing both that the defect was "visible and apparent" *and* that it "exist[ed] for a sufficient length of time prior to the accident to permit defendant's employees to discover and remedy it." *Gordon v. Am. Museum of Natural History,* 67 N.Y.2d 836, 837 (1986). Here, the evidence arguably suffices to show the former, as Fager offers photographs showing a dangling string or rope on the stairway, *see* ECF Nos. 65-3 & 4, one of which, he testified, "fairly and accurately show[ed] the rope . . . as it appeared on the day of [his] accident," Pl.'s Dep. 86; *see, e.g.*, *Ricci v. Wal-Mart Stores E., LP*, No. 16-CV-6920 (JCM), 2018 WL 4308556, at *8 (S.D.N.Y. Sept. 10, 2018) (collecting cases holding that a plaintiff may establish constructive notice of a condition through testimony that it was observed after the event at issue and photographs of the condition).[8] But there is no evidence in the record from which a reasonable jury could find that the rope "exist[ed] for a sufficient length of time prior to the accident to permit defendant's employees to discover and remedy it." *Gordon*, 67 N.Y.2d at 837. Indeed, Fager does not dispute that neither he "nor any other witness could testify when the 'dangling rope' was placed there" or "how it got there." Pl.'s Boingo Opp'n 26 (internal quotation marks omitted); *see, e.g.*, Pl's Dep. 156; Rossello Dep. 48, 97.

[8] The Court says "arguably" for two reasons. First, Fager somewhat undermined his assertion that the photograph "fairly and accurately" depicted the scene by observing, in the same breath, that the "the rope was more towards the center of the tread" when he fell. Pl.'s Dep. 147. Second, there is no evidence that the photographs were taken close in time to the accident, as some New York cases require, at least where "ephemeral" conditions are involved. *See, e.g.*, *Melendez v. N.Y.C. Transit Auth.*, 601 N.Y.S.2d 489, 490 (1st Dep't 1993); *Bolloli v. Waldbaum, Inc.,* 896 N.Y.S.2d 400, 402 (2d Dep't 2010) (internal quotation marks omitted); *Anderson v. Weinberg*, 894 N.Y.S.2d 292, 293 (4th Dep't 2010). The photographs "are undated," and "no one has testified who took [them] or when they were taken." Amtrak Defs.' 56.1 Stmt. ¶ 34. At best, Rossello inferred, based on the appearance of the room, that the photographs "could have" been taken "back in 2022," which means they may have been taken many months after Fager's alleged accident. Rossello Dep. 50.

In short, Fager has failed to raise a triable as to whether Defendants created or had actual or constructive notice of the condition that allegedly caused his accident. Accordingly, Defendants are entitled to summary judgment on his Section 200 and negligence claims.

**3. Section 240(1)**

Fager's Section 240(1) meets the same fate. Section 240(1), commonly known as the "Scaffold Law," imposes strict liability for the failure to provide adequate protection to workers from certain elevation-related hazards. *See Ross v. Curtis-Palmer Hydro-Elec. Co.*, 81 N.Y.2d 494, 499-501 (1993). To prevail, a plaintiff must show the existence of an elevation-related hazard of the type encompassed by the statute and an injury proximately caused by the absence of proper protection from that hazard. *See O'Brien v. Port Auth. of N.Y. & N.J.*, 29 N.Y.3d 27, 33 (2017). Although Section 240(1) is meant to be liberally construed, its "extraordinary protections" encompass "a narrow class of dangers": those "special hazards" "arising from . . . physically significant elevation differential[s]," as distinct from the "usual and ordinary danger[s]" present at a construction site. *Nicometi v. Vineyards of Fredonia, LLC,* 25 N.Y.3d 90, 96-97, 99 (2015) (cleaned up); *see also Jones v. 414 Equities LLC*, 866 N.Y.S.2d 165 (1st Dep't 2008) (explaining that "no bright-line test exists for determining whether a worker was exposed to an elevation-related risk" within the meaning of Section 240(1) and setting forth relevant factors). Thus, where a plaintiff's injuries result from "separate and ordinary" hazards, unrelated to the special elevation risk that "brought about the need for a safety device" in the first place, no liability attaches. *Nicometi*, 25 N.Y.2d at 98-99 (cleaned up).

Here, the parties devote much of their briefing to whether the fact that (1) the stairway is a permanent fixture (2) on which Fager was not performing any construction work dooms his claim. *See, e.g.*, Amtrak Defs.' Mem. 8-9; Boingo Mem. 15-18; ECF No. 92 ("Boingo's

Reply"), at 7-8; ECF No. 97 ("Amtrak Defs.' Reply"), at 5-6. But even assuming that Defendants are wrong on both counts, Fager's claim fails because no reasonable jury could find that his injuries were proximately caused by an "elevation-related risk" within the meaning of the Scaffold Law. *Nicometi,* 25 N.Y.3d at 97. The crux of Fager's argument is that the dangling rope, which he characterizes as a "mislaid object left unattended," Pl.'s Mem. 18, rendered the alternating tread stairway an inadequate safety device. *See id*. 9-11; Pl.'s Boingo Opp'n. 11-15; Pl.'s Amtrak Defs. Opp'n 8-9; *see also* Pl.'s Dep. 82 (disclaiming knowledge as to why someone would affix the rope on the stairway); Amtrak Dep. 211-12 (same); Boingo Dep. 292-93 (same); Skanska Dep. 135-36, 196 (same); Rossello Dep. 46-48, 97, 111-12 (same); Silberman Report 7-8 (opining that the rope, which served no "useful or necessary function" in connection with the construction work, "rendered [it] unsafe and inadequate"). The risk of falling from the stairway due to the presence of a "mislaid object," however, is akin to the "usual and ordinary danger[s]" present "at [a] construction site" that Section 240(1) does not cover. *Nicometi*, 5 N.Y.3d at 99 (internal quotation marks omitted); *see also, e.g.*, *id*. at 99-100 (citing cases holding that injuries due to tripping or slipping on obstacles while using a safety device — including one case in which the plaintiff tripped over two unconnected pipes protruding from a wall while descending a ladder and another in which the plaintiff stepped off a ladder and tripped over a portable light — do not give rise to Section 240(1) liability). The fact that the presence of the rope may have "amplified the danger inherent in working at an elevated height" is not enough to support a claim under the statute. *Id.* at 100 n.3.

Of note, Fager does not dispute that — but for the rope — the stairway was an appropriate safety device to guard against the special risks associated with having to reach his work area. Indeed, despite the cases on which he relies, he does not argue (1) that any part of the

device itself (or its placement or use) was inadequate, *cf., e.g.*, *Skydaniuk v. ESRT Empire State Bldg., LLC*, 236 N.Y.S.3d 115, 117 (1st Dep't 2025) (finding a statutory violation where a carpenter covered a stationary escalator, "which served as the sole means of access between two levels of [a] construction site," "with plastic sheeting," and "duct-taped custom-cut Masonite boards to the sheeting," and then the plaintiff "tripped and fell on the escalator when duct tape got stuck to his boots and he slid on the Masonite"); *Conlon v. Carnegie Hall Soc'y, Inc.*, 70 N.Y.S.3d 833, 833 (1st Dep't 2018) (rejecting an argument that the fact that the plaintiff "tripped on an extension cord" while working in a stairwell removed his case from Section 240(1)'s ambit where the stairwell lacked a handrail); or (2) that the circumstances of his work rendered the stairway inadequate, *cf., e.g.*, *Cruz v. Turner Constr. Co.*, 720 N.Y.S.2d 10, 11-12 (1st Dep't 2001) (finding a violation where an oily substance commonly used in the plaintiff's work dripped on the ladder on which he was standing and caused him to fall).[9] Nor does Fager argue

[9] The short Appellate Division decision in *Conlon*, upon which Fager relies heavily, does not reference the fact that the stairwell lacked a handrail as the basis for liability under Section 240(1); instead, the opinion states only that the plaintiffs were entitled to judgment on their claim because it was "clear that plaintiff's fall was the direct result of absence of an adequate safety device." *Conlon v. Carnegie Hall Soc'y, Inc.*, 70 N.Y.S.3d 833, 833 (1st Dep't 2018). The lower court opinion, however, makes plain that the safety device was "inadequate" because it lacked a railing. *See Conlon v. Carnegie Hall Soc'y, Inc.*, No. 24165/2013E, 2016 WL 11687617, at *2 (N.Y. Sup. Ct. Oct. 3, 2016). Fager seizes on the Appellate Division's statement that the fact "[t]hat plaintiff tripped on an extension cord does not take the case out of the ambit of Labor Law § 240(1)." 70 N.Y.S.3d at 833; *see, e.g.*, Pl.'s Mem. 9-10; Pl.'s Boingo Opp'n 11-12. True enough. But the Appellate Division did not suggest, let alone hold, that liability would have attached had the stairwell been "adequate" — i.e., had it had a railing. *See, e.g.*, *Segovia v. Genting New York LLC*, No. 158020/2020, 2023 WL 2213728, at *1 (N.Y. Sup. Ct. Feb. 22, 2023) (characterizing *Conlon* as holding that the "plaintiff [was] entitled to summary judgment on [his] Labor Law 240(1) claim where his fall on the stairs was directly attributable to the absence of an adequate safety device, namely a handrail, rather than the extension cord on which [he] tripped"); *see also Nicometi v. Vineyards of Fredonia, LLC,* 25 N.Y.3d 90, 100-01 (2015) (observing that liability might attach under Section 240(1) if "a plaintiff slipped on ice while working on elevated scaffolding and fell off the scaffolding *due to insufficient guardrail protection*" (emphasis added)). In this case, by contrast, Fager provides no evidence that the stairway itself was inadequate.

that any special elevation-related risk could have been mitigated by an *additional* safety device of the kind contemplated in the statute. *Cf., e.g.*, *Hovorka v. Applied Prods. Co., Inc.*, 154 N.Y.S.3d 435, 435 (1st Dep't 2021) (rejecting the "[d]efendants' assertion that the presence of ice removed plaintiff's fall from the scope of Labor Law § 240(1)" where the elevation-related risk of walking on an elevated retaining wall "could have been mitigated by providing the type of protective devices listed in § 240(1)"). In short, the stairway itself fulfilled the core statutory purpose of "allowing [Fager] to safely complete his work at a height," and, to the extent it failed to prevent his fall, it was because "[t]he protective equipment envisioned by the statute [was] simply not designed to avert the hazard [he] encountered." *Nicometi*, 25 N.Y.3d at 98 (internal quotation marks omitted).

*Gomez v. Tilden Estates, LLC*, 240 N.Y.S.3d 459 (2d Dep't 2025), is illustrative. There, the plaintiff was allegedly injured when he fell backward while carrying equipment up a staircase to the roof of the premises. *See id.* at 462. In holding that he fell short of establishing Section 240(1) liability as a matter of law, the Second Department reasoned that the plaintiff had "failed to eliminate triable issues of fact as to whether his alleged injuries were caused by a 'separate hazard . . . unrelated to any elevation risk'" because he testified that he had fallen "due to slipping on dust on the steps." *Id.* at 464. The risks of falling due to the dangling rope at issue here are virtually indistinguishable from those of falling due to the dust at issue in *Gomez.* And although the Second Department also went on to find that the defendants were likewise not entitled to summary judgment, it did so only because genuine issues persisted "as to whether the plaintiff was engaged in elevation-related work that required *additional* safety devices to be safely performed, and whether the plaintiff's alleged injuries were caused by the absence of such safety devices." *Id.* (emphasis added). By contrast, as discussed, Fager does not provide any

other basis for a jury to conclude that his injuries were even partially attributable to the failure to take the statutorily required measures to protect against any special elevation hazard. *Cf., e.g.*, *Crimi v. Neves Assocs.*, 761 N.Y.S.2d 186, 187-88 (1st Dep't 2003) (granting summary judgment to a plaintiff even though his "fall [from a permanently affixed ladder] may also have been caused by debris" because "the record demonstrate[d]" that he "fell down a steep ladder with very narrow rungs," and so there was "no question that his injuries were at least partially attributable to [the] failure to take statutorily mandated safety measures to protect him from risks arising from an elevation differential" (cleaned up)).

In short, Fager has failed to raise a triable issue that his alleged injuries were proximately caused by a violation of Section 240(1), and summary judgment therefore must be granted to Defendants on that claim.

**4. Section 241(6)**

Fager's final claims are brought under Section 241(6) of the New York Labor Law, which imposes non-delegable duties to provide "reasonable and adequate protection and safety" in "areas in which construction, excavation or demolition work is being performed." N.Y. LAB. LAW § 241(6); *see Rizzuto v. L.A. Wenger Contracting Co.*, 91 N.Y.2d 343, 348-49 (1998). "To prevail on a § 241(6) claim, a plaintiff must show that his injury was proximately caused by a violation of a specific and concrete Industrial Code regulation." *Arneman v. Republic of Turkey*, No. 22-CV-5701 (DEH), 2026 WL 621460, at *2 (S.D.N.Y. Mar. 5, 2026) (internal quotation marks omitted) (quoting *Zaino v. Rogers*, 153 A.D.3d 763, 760 (2d Dep't 2017)); *see also Walter v. CSX Transp., Inc.*, No. 22-1254, 2023 WL 4044113, at *2 (2d Cir. June 16, 2023). Significantly, unlike Section 200, Section 241(6) "imposes vicarious liability *for the negligence of a subcontractor,* even in the absence of control or supervision of the worksite and without

regard to the owner, general contractor, or agent's fault." *In re World Trade Ctr. Lower Manhattan Disaster Site Litig.*, 44 F. Supp. 3d 409, 436 (S.D.N.Y. 2014) (cleaned up) (quoting *Rizzuto,* 91 N.Y.2d at 348-50). A violation of an applicable Industrial Code violation, however, does not establish liability; instead, it is evidence of negligence to be considered by the jury. *See Rizzuto,* 91 N.Y.2d at 348-51.

In this case, Fager asserts violations of four regulations: 12 N.Y.C.R.R. § 23-1.7(d), (e)(1), (e)(2), and (f). *See* FAC ¶ 159; ECF No. 65-2, at 4-5. Section 23-1.7(d) protects employees against "slipping hazards," stipulating that "[e]mployers shall not suffer or permit any employee to use," among other things, a passageway "or other elevated working surface [that] is in a slippery condition." 12 N.Y.C.R.R. § 23-1.7(d). Similarly, Section 23-1.7(e)(1) mandates that "all *passageways* shall be kept free from accumulations of dirt and debris and from any other obstructions or conditions which could cause tripping." *Id.* § 23-1.7(e)(1) (emphasis added). Section 23-1.7(e)(2) provides that "[t]he parts of floors, platforms *and similar areas* where persons work *or pass* shall be kept free from accumulations of dirt and debris and *from scattered tools and materials and* from sharp projections insofar as may be consistent with the work being performed." *Id.* § 23-1.7(e)(2) (emphasis added). And finally, Section 23-1.7(f) requires that "[s]tairways, ramps or runways . . . be provided as the means of access to working levels above or below ground except where the nature or the progress of the work prevents their installation in which case ladders or other safe means of access shall be provided." *Id.* § 23-1.7(f).

Fager's Section 23-1.7(d) claim requires little discussion. Fager does not contest Boingo's argument that this claim fails "because [he] does not allege that he slipped on a foreign substance as defined in this section." Boingo's Mem. 21 n.2. In fact, he concedes that "the condition at issue (the dangling rope) is not a slipping condition." Pl.'s Amtrak Defs. Opp'n 15;

*see also* Pl.'s Boingo Opp'n 19 (echoing this position). Thus, Fager "has forfeited any argument" that Section 23-1.7(d) applies to his case and "effectively conceded the point." *Kamat v. League Network, PBC*, No. 25-CV-3307 (JMF), 2026 WL 183697, at *3 (S.D.N.Y. Jan. 23, 2026) (cleaned up). The claim accordingly must be and is dismissed. As for the remaining regulations that Fager invokes, Fager contends that he is entitled to summary judgment with respect to all three provisions, *see, e.g.*, Pl.s' Mem. 15-19, while Defendants insist that the first two regulations are inapposite and that the third, while applicable, was not violated, *see, e.g.*, Amtrak Defs.' Mem. 13-15; Boingo's Mem. 21-27. The Court disagrees with both sides. In brief, no one is entitled to summary judgment on these claims.

Fager's motion can be quickly rejected. At a minimum, Fager is not entitled to summary judgment because he has not established as a matter of law that (1) he fell, (2) that the dangling rope was on the stairway, and (3) that the rope, even if it was on the stairway, proximately caused his fall. A reasonable jury could certainly credit his account of events, finding his testimony credible and corroborated by other evidence in the record, such as Rossello's testimony that he heard Fager call out in some way, observed the rope when he descended the stairs, and (assuming it is admissible) was told by Fager that he "tripped on the rope." Rossello Dep. 53. At the same time, a reasonable jury could also find for Defendants — for example, on the theory that the absence of any direct witnesses, Castelli's testimony that he was not informed about the rope when Fager reported the accident, and the incident report's silence on that subject undermine Fager's testimony about the fall, the presence of the rope, and causation. *See also* ECF No. 69-2, ¶ 9 ("Danatzko Aff."). Thus, Fager's motion for summary judgment fails.

Defendants' cross-motions require a more detailed discussion, but they too fall short. First, contrary to their assertions, neither Section 23-1.7(e)(1) nor Section 23-1.7(e)(2) is

inapplicable as a matter of law. Defendants contend that subsection (e)(1) does not apply because stairways are not passageways within the meaning of the regulation. *See, e.g.*, Amtrak Defs.' Mem. 13-14; Boingo's Mem. 22-24. The Industrial Code does not define the term "passageway," but in interpreting the same term in Section 23-1.7(d), which, as noted, addresses slipping hazards, New York courts have held that a stairway is a passageway if it "is the sole [means of] access to the work site." *Tolk v. 11 W. 42 Realty Invs., L.L.C.*, 160 N.Y.S.3d 237, 238 (1st Dep't 2022); *see also, e.g.*, *Harasim v. Eljin Const. of New York, Inc*., 966 N.Y.S.2d 387 (1st Dep't 2013) (same). As other courts have, the Court concludes that the term should be given the same meaning in Section 23-1.7(e)(1). *See, e.g.*, *Gonzalez v. 446 Broadway Owner LLC*, 2025 N.Y. Misc. LEXIS 310, at *29-30 (Sup. Ct., NY Co. 2025) (applying this same rule); *see also Rossi v. 140 W. JV Manager LLC*, 99 N.Y.S.3d 38, 39 (1st Dep't 2019) (defining "the only route [the plaintiff] could take to return to his work area" as a passageway for the purposes of Section 23-1.7(e)(1)); *Homola v. Praxair, Inc*., 412 F. App'x 397, 399-400 (2d Cir. 2011) (interpreting the meaning of "passageway" in Sections 23-1.7(d) and (e)(1) in conjunction). *See generally People v. Corr*, 42 N.Y.3d 668, 673 (2024) ("[A]bsent any indication of an intention to the contrary, where the same word or phrase is used in different parts of a statute, it will be presumed to be used in the same sense throughout, and the same meaning will be attached to similar expressions in the same or a related statute." (internal quotation marks omitted)). It follows that Defendants' contention that Section 23-1.7(e)(1) is inapplicable as a matter of law fails, as there is evidence from which a reasonable jury could find that the alternating tread stairway was the sole means of accessing Fager's work site on the date of the alleged fall. *Compare, e.g.*, Pl.'s 56.1 Stmt. ¶ 13; Amtrak Defs.' Pl. 56.1 Resp ¶ 13; Skanska Dep. 123-24,

178-79; Castelli Dep. 116; Occhuizzo Aff. ¶¶ 8-9, *with* Boingo's 56.1 Stmt. & Pl. Resp. 5 ¶ 13; Amtrak Dep. 194-97.

Similar logic defeats Defendants' arguments that Section 23-1.7(e)(2) does not apply because the stairway was not a working area. *See, e.g.*, Amtrak Defs.' Mem. 14; Boingo's Mem. 25. Although there is some contrary authority, New York courts have held that Section 23-1.7(e)(2) can apply to a fall from a stairway at a construction site even when the plaintiff was not performing work on the stairway itself. *See, e.g.*, *Piedra v. 111 W. 57th Prop. Owner LLC*, 196 N.Y.S.3d 64, 65-66 (1st Dep't 2023) (finding liability on a Section 241(6) claim predicated on subsection (e)(2) where the plaintiff "slipped on a piece of wood while descending a staircase at the construction site where he was working" because "the staircase constituted a passageway and the wood created a tripping hazard"); *Aguilera v. Pistilli Const. & Dev. Corp.*, 882 N.Y.S.2d 148, 149-50 (2d Dep't 2009) (finding that the defendant "failed to . . . demonstrat[e] the inapplicability of 12 NYCRR 23-1.7(e)(1), (e)(2), and (f)" as a matter of law where "[t]he plaintiff allegedly slipped on debris while walking down a staircase from the work site on the fourth floor to a lower level"); *see also Quigley v. Port Auth. of New York*, 90 N.Y.S.3d 156, 158 (1st Dep't 2018) (upholding the denial of a defendant's motion for summary judgment on a claim involving Section 23-1.7(e)(2) because "[t]he workers at the site routinely traversed the area adjacent to the shanty [where the plaintiff slipped and fell] as their only access to equipment," and thus there was "a triable issue as to whether the spot where [the] fall occurred was a 'working area' within the meaning of 12 NYCRR 23-1.7(e)(2)" (cleaned up)). *But see, e.g.*, *Dyszkiewicz v. City of New York*, 194 N.Y.S.3d 33, 37-39 (2d Dep't 2023) (finding, where "plaintiff allegedly slipped on [a] clear, sticky liquid on the top step" of a stairway "while carrying half of a metal doorframe down the stairway," that "the defendants established that 12

NYCRR 23-1.7(e)(2)" did not apply "because it applies to working areas, and the plaintiff asserts that the staircase in which his accident occurred was a 'passageway,' as opposed to a 'working area'"). That conclusion is consistent with the plain language of Section 23-1.7(e)(2), which "applies to 'floors, platforms[,] *and similar areas* where persons work *or pass*.'" *Ruisech v. Structure Tone Inc.*, 42 N.Y.3d 1061, 1065 n.2 (2025) (emphasis added) (quoting 12 N.Y.C.R.R. § 23-1.7(e)(2)). A reasonable jury could therefore find that the stairway at issue, even if not Fager's worksite itself, qualified as an area covered by Section 23-1.7(e)(2).

Boingo also makes a half-hearted argument that the rope does not constitute "scattered tools and materials" within the meaning of subsection (e)(2). *See, e.g.*, Boingo's Mem. 24-25. But it falls just as flat. There is no evidence that the rope was part of the stairway, *cf. Parker v. Ariel Assocs. Corp.*, 798 N.Y.S.2d 489, 491 (2d Dep't 2005) (finding subsection (e)(2) inapplicable because the accident was allegedly "caused by a piece of plywood which was part of the floor"), or that it served any purpose at all on the stairway, *cf. Cioppa v. ESRT 112 W. 34th St., L.P.*, 219 N.Y.S.3d 667, 667 (1st Dep't 2024) (finding that the "perforated plywood board" on which the plaintiff allegedly tripped was not "an accumulation of debris or . . . part of a scattering of tools and materials" as a matter of law because it had been "deliberately placed on the stripped floor as a protective measure" (cleaned up)). On the contrary, as noted above, no witness could explain why someone would tie the anchor to the rope and leave it on the stairway. *See* Pl.'s Dep. 82; Amtrak Dep. 211-12; Boingo Dep. 292-93; Skanska Dep. 135-36, 196; Rossello Dep. 46-48, 97, 111-12; *see also* Castelli Dep. 45-46, 59. And Rossello testified that, when workers left similar items strewn about the worksite, he would cut down the rope and caution them not to leave such ropes or drag lines, as he described them, in dangerous places.

*See* Rossello Dep. 109-112. On that record, a reasonable jury could certainly conclude that the dangling rope constituted "scattered tools and materials." 12 N.Y.C.R.R. § 23-1.7(e)(2).

That leaves Section 23-1.7(f), which "imposes a duty upon a defendant" not just to provide *a* stairway "as the means of access to working levels above or below," 12 N.Y.C.R.R. § 23-1.7(f), but "a *safe* staircase, free of defects," *Solarte v. Brearley Sch.*, 234 N.Y.S.3d 178, 181 (1st Dep't 2025) (emphasis added) (internal quotation marks omitted). That includes debris and other dangerous conditions. *See, e.g.*, *Aguilera*, 882 N.Y.S.2d at 149-50 (finding that the defendant failed to show that this regulation was inapplicable as a matter of law where "[t]he plaintiff allegedly slipped on debris while walking down a staircase from the work site on the fourth floor to a lower level"); *cf. Murphy v. Am. Airlines, Inc.*, 715 N.Y.S.2d 62, 63 (1st Dep't 2000) ("Plaintiff was not injured as a result of a defect in the staircase or debris left thereon in violation of 12 NYCRR 23-1.7(f)."). Here, there is no dispute that Defendants supplied a stairway for Fager to access his elevated work area. *See* Boingo's Mem. 26. But given the alleged presence of the rope, there is a triable issue of fact as to whether that stairway was safe and, thus, whether the regulation was violated. *Contra* Amtrak Defs.' Mem. 14-15.

In sum, there are triable issues with respect to three of the four regulations at issue here. A reasonable jury could — but need not — find that "someone within the chain of the construction project was negligent in not exercising reasonable care, or acting within a reasonable time, to prevent or remediate the hazard, and that" Fager's fall "and subsequent injury proximately resulted from such negligence." *Rizzuto*, 91 N.Y.2d at 351; *see also id.* at 348-49 ("[S]ection 241(6) imposes liability . . . *for the negligence of a subcontractor,* even in the absence of control or supervision of the worksite."). At trial, the jury may also consider whether Fager was negligent, but Defendants have not established that he was as a matter of law,

*compare, e.g.*, Pl.'s Dep. 57-58, 77, 87-88; Rossello Dep. 30-32, 41-43; Boingo's 56.1 Stmt. & Pl. Resp. 11 ¶ 34, Silberman Dep. 44-46, 48-50, 86; Silberman Aff. ¶ 5 & Ex. 3, at 2; *with* ECF No. 76-2 ("Darius Report"), at 31, Amtrak Defs.' Pl. 56.1 Resp. ¶ 34, and, in any event, any negligence on his part would not bar recovery altogether, *see Matter of Buchanan Marine, L.P.*, 874 F.3d 356, 369 (2d Cir. 2017) ("Under [New York's comparative negligence] statute, liability is split between plaintiffs and defendants based on the relative culpability and causal significance of their conduct." (internal quotation marks omitted) (citing N.Y. C.P.L.R. § 1411)); *see also, e.g.*, *O'Brien v. Tectonic Builders Inc*., 243 N.Y.S.3d 408, 409 (1st Dep't 2025) ("Any comparative negligence on the part of plaintiff does not defeat his claim under Labor Law § 241(6)." (citing, as relevant, *Rodriguez v. City of New York*, 31 N.Y.3d 312, 324 (2018))); *Fuentes v. 257 Toppings Path*, LLC, 207 N.Y.S.3d 582, 585 (2d Dep't 2024) ("Any comparative negligence on the part of the injured plaintiff does not preclude liability founded upon a violation of Labor Law § 241(6)." (cleaned up)).

**5. Crossclaim for Indemnity and Contribution**

That leaves the cross-motions for summary judgment with respect to the Amtrak Defendants' crossclaims for indemnity and contribution. Amtrak Defs.' Answer 6-7. The Court need not spill much ink on them — if only because the parties themselves spill virtually no ink on them. The Amtrak Defendants' memorandum of law devotes only two sentences to why they are entitled to summary judgment on the crossclaims: "[T]he evidence shows that Boingo was the contractor and that E-J was the subcontractor retained to perform the work at issue herein. Defendants did no physical work, nor did they exercise supervision or control over the work." Amtrak Defs.' Mem. 16. Boingo's principal memorandum of law is even more succinct: "Inasmuch as BOINGO has fully established its *prima facie* entitlement to dismissal of all claims

premised upon negligence and Labor Law, BOINGO is also entitled to dismissal of the cross-claims." Boingo's Mem. 27. These perfunctory arguments are arguably insufficient to even raise the issues for the Court's consideration. *See, e.g.*, *Lima v. Hatsuhana of USA, Inc.*, No. 13 CIV. 3389 JMF, 2014 WL 177412, at *1 (S.D.N.Y. Jan. 16, 2014) ("It is well established that issues mentioned in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived." (cleaned up) (collecting cases)). In any event, it follows from the discussions above that neither side is entitled to summary judgment on the crossclaims. *See also, e.g.*, *Han v. InterExchange, Inc.*, No. 23-CV-07786 (JLR), 2024 WL 3990770, at *21 (S.D.N.Y. Aug. 28, 2024) ("Generally, claims concerning indemnification obligations are not ripe for adjudication until liability has been imposed upon the party to be indemnified."). Accordingly, the cross-motions for summary judgment on the Amtrak Defendants' crossclaims must be and are denied.

**CONCLUSION**

In sum, the Court resolves the pending motions as follows: First, Boingo's motion to preclude in whole or in part certain testimony by four of Fager's experts is GRANTED in part and DENIED in part. Next, summary judgment is entered in favor of Defendants with respect to Fager's Section 200 and common-law negligence claims, his Section 240(1) claim, and his Section 241(6) claim predicated on Section 23-1.7(d). Genuine issues of fact, however, preclude the entry of summary judgment in favor of any party with respect to Fager's remaining Section 241(6) claims. Thus, the Amtrak Defendants' and Boingo's motions for summary judgment on Fager's claims are GRANTED in part and DENIED in part, while Fager's motion for summary judgment is DENIED in toto. Finally, the Amtrak Defendants' and Boingo's motions for

summary judgment on the crossclaims are also DENIED, with the caveat that the Amtrak Defendants may renew their motion if and when it becomes ripe.

Unless and until the Court orders otherwise, the parties shall submit their proposed Joint Pretrial Order and associated materials (in accordance with Rule 26(a)(3) of the Federal Rules of Civil Procedure and Section 6 of the Court's Individual Rules and Practices in Civil Cases, available at https://www.nysd.uscourts.gov/hon-jesse-m-furman) **within thirty days of the date of this Opinion and Order**. The parties must be prepared to go to trial as soon **as two weeks thereafter**, but the Court will promptly schedule a trial date — or at least a conference to discuss a trial date — after reviewing the parties' submissions. That said, the Court is of the view that the parties should try to settle this case without the need for a trial. To that end, the Court directs the parties to confer immediately about the prospect of settlement, including participation in a settlement conference before Magistrate Judge Sarah Netburn (or before a mediator appointed by the Court or retained privately). If the parties agree that a settlement conference would be appropriate, they should promptly advise the Court and may seek an appropriate extension of the pretrial deadlines to focus on settlement.

The Clerk of Court is directed to terminate ECF Nos. 62 and 72.

SO ORDERED.

Dated: August 28, 2026
New York, New York

JESSE M. FURMAN
United States District Judge